## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Criminal No. 3:16-CR-222** |
| **v.** | : | **(JUDGE MANNION)** |
| **LOUIS ANTONIO ZAYAS,** | : | |
| **Defendant.** | : | |

**FILED
SCRANTON**

OCT 2 2 2024

Per ⎍KC

**DEPUTY CLERK**

## <u>MEMORANDUM</u>

Presently before the court is Petitioner-Defendant (hereinafter "Defendant"), Louis Antonio Zaya's, *pro se* motion to vacate pursuant to 18 U.S.C. §2255, (Doc. 209), motion for an expansion of the record, (Doc. 211), motion for an evidentiary hearing, (Doc. 230), and motion for appointment of counsel, (Doc. 232). On June 21, 2019, Defendant was convicted of, *inter alia*, distribution of fentanyl resulting in the death of a pregnant individual after a 4-day trial. Specifically, Defendant was found to have distributed and conspired to distribute fentanyl resulting in death, distributed and possessed with the intent to distribute fentanyl within 1,000 feet of a playground,[1] and

---

[1] This count was later vacated by the Third Circuit in *United States v. Zayas*, 32 F.4th 211, 229 (3d Cir. 2022), *cert. denied*, 143 S. Ct. 830, 215 L. Ed. 2d 78 (2023). On May 25, 2022, an amended judgment was issued dismissing Count 3 of the Superseding Indictment and lifting its term of 1 year imprisonment. (Doc. 203). Defendant still faces two mandatory terms of life imprisonment on each of Counts 1 and 2, and a term of 1 year imprisonment on Count 4, all to run concurrently. *Id.*

distributed and possessed with the intent to distribute fentanyl to a pregnant individual.  On January 31, 2020, this court sentenced Defendant to two mandatory terms of life imprisonment, among others, to run concurrently. (Doc. 167). Subsequently, the Third Circuit, with the exception of Count 3, affirmed the conviction.[2] However, through the present motion Defendant seeks to collaterally attack his conviction and sentence by arguing ineffective assistance of counsel against his trial and appellate counsel. Defendant presents seven grounds upon which he asks the court to "vacate, set aside or reverse [Defendant's] convictions and sentence and remand for new trial and/or release or resentence on lesser included charges." (Doc. 209, p. 12). As discussed more fully herein, the court finds that all these grounds lack merit and will **DENY** all of Defendant's motions without the need for a hearing.

## I. BACKGROUND

Around midnight on July 7, 2016, Kathryn Ann Price was found dead in her bed by her sister, while her one-year-old son and one-year-old niece slept nearby. Price, who was eight months pregnant, was found unresponsive by responding paramedics on the scene. The investigators who responded to the emergency call observed evidence in Price's bedroom

---

[2] See supra, note 2.

consistent with an apparent drug overdose. This included drug paraphernalia such as a spoon, syringes, and many white and blue glassine baggies. Testing of the residue in a blue baggie established that it contained fentanyl, the same substance later confirmed as the cause of Price's death in the conducted autopsy. Nothing else caused or contributed to her death.

Text messages between Price and Defendant shortly before her death and video from surveillance cameras outside of Price's house soon caused investigators to shift their focus to the Defendant. The text messages revealed that Defendant (named "Lou" over text) had delivered drugs to Price the same evening that she died and that she had ingested those drugs before her death. Specifically, on July 5, 2016, the conversation went as follows:

**Kathryn Ann Price:** "Sup"
**Louis Zayas:** "Hey I made a new contact with damn good shit."
**Kathryn Ann Price:** "Like how good."
**Louis Zayas:** "Not like the best I've ever had but good enough to get way higher than intended lol."
**Louis Zayas:** "I actually get it from the middle man Scotts friend justin."
**Kathryn Ann Price:** "How much. U got one I can try Ima get shit on Thursday plus I was gonna give u hafe for helping me out. Unless u want the 10. U work later. Ima try to get sum cash how much 40?"
**Louis Zayas:** "Yeah 40 but I'd rather give him 60 than give these guys another 30 lol." "I'll ask Justin if I can just give you his number ok."

- 3 -

(Doc. 154, ¶10). On the following day, July 6, 2016, additional text messages took place between Price and Defendant involving the collection of money, drug quantities, and meeting locations, including the following:

**Louis Zayas:** "He's just getting off Hazleton exit now he's gonna call me back in a minute."

**Kathryn Ann Price:** "Ok."

**Louis Zayas:** "He is good though. N he will do 1 n a half 4 50.

**Kathryn Ann Price:** "So you wanna meet him here. He's got it on him? Ask him how long…My sister will be home soon."

**Louis Zayas:** "Call u in 1 min."

**Kathryn Ann Price:** "Pull into the parking lot." "Give me a min my sister is leaving."

**Louis Zayas:** "Sorry didn't c ur texts til just now."

**Kathryn Ann Price:** "Please don't forget about the sub I need it for the morning.…Friday I get paid to so Ima give u either cash or tic for it whichever u prefer."

(Doc. 154, ¶11). At 3:55 pm on July 6, 2016, a security camera captured Price engaging in a hand-to-hand transaction with the occupant of a silver car which was later confirmed to be owned by Defendant. (*Id.*, ¶12). At 5:11 pm, the same silver car returns when Price is seen exiting her residence and engaging in another hand-to-hand transaction with the vehicle

- 4 -

occupants before returning to her residence. (*Id.*). The video also confirmed that after Price obtained drugs from Defendant, she returned to her house and subsequently left only once to walk her dog. (*Id.*, ¶¶12-13). During trial, DEA special agent Joseph Begley ("S.A. Begley") testified that he watched every second of the video and, other than the above-described transactions between Defendant, Price and "Justin," the other silver car occupant (later identified by Defendant as Justin Haines), no one else was observed arriving at the Price residence and no vehicles were observed stopping in the vicinity of the residence.

Based on this evidence, investigators arrested Defendant at his home and searched the house upon consent of Defendant's mother, owner of the house. During a Mirandized interview immediately following his arrest, Defendant admitted to selling what he believed to be heroin to Price on the day she overdosed.

At trial, the Government showed how Defendant's drug delivery and Price's death played out on surveillance video and by cell phone communications. In addition, trial testimony was provided explaining that only fentanyl at 24 nanograms per milliliter, and norfentanyl (a metabolite of fentanyl) at 12 nanograms per milliliter were found in Price's autopsy blood.

One blue glassine bag found within inches of Price's body, with enough residual substance left in it to be tested, was sent to the laboratory for analysis and found to have contained only fentanyl, the same controlled substance found in Price's toxicology.

Thereafter, Defendant entered into a plea agreement and a guilty plea with the court, which he subsequently asked to withdraw. Defendant also asked to remove his first, and then second counsel. All those requests were granted. (*See* Docs. 43, 47 and 72). After successfully withdrawing his guilty plea, Defendant then asked to remove his third counsel, which the court granted again. (Doc. 78).

Given the withdrawal of the plea agreement, the Government successfully pursued, prior to trial, a superseding indictment charging defendant with (1) conspiracy to distribute and possess with the intent to distribute a controlled substance resulting in death in violation of 21 U.S.C. §§846, 841(a)(1) and (b)(1)(C); (2) distribution and possession with the intent to distribute a controlled substance resulting in death in violation of 21 U.S.C. §841(a)(1) and (b)(1)(C) and 18 U.S.C.§2; (3) distribution and possession with the intent to distribute a controlled substance within 1,000 feet of a daycare center with an attached outdoor playground in violation of 21 U.S.C.

§§841(a)(1) and (b)(1)(C), 860,[3] and 18 U.S.C. §2; and (4) distribution and possession with the intent to distribute a controlled substance to a pregnant individual in violation of 21 U.S.C. §§861(f), 841(a)(1) and (b)(1)(C), and 18 U.S.C. §2. (Doc. 94).

Prior to trial, Defendant's attorney submitted a trial brief whereupon he noted that Defendant anticipated two potential legal issues regarding: (1) the admissibility of Defendant's prior guilty plea and plea colloquy; and (2) the Government's "burden to prove beyond a reasonable doubt that the controlled substance provided to the victim by the Defendant was the "but for" cause of the victim's death. *Burrage v. United States*, 571 U.S. 204 (2014)." (Doc. 125, p. 1).

During trial, Defendant's pursued legal strategy was to create reasonable doubt on whether the drugs he sold Price were the ones that led to her death. In essence, Defendant contended that the fentanyl that led to Price's death stemmed from blue glassine bags sold by another dealer, while he sold Price what he believed to be heroin in white glassine bags. Following the close of all evidence, Defendant moved for judgment of acquittal under Rule 29(a) of the Federal Rule of Criminal Procedure. That motion was denied. On June 21, 2019, the jury returned a verdict of guilty on all counts

---

[3] *See supra*, notes 1 and 2.

in the Superseding Indictment. (Doc. 133). On January 31, 2020, the court conducted a sentencing hearing during which the court addressed Defendant's objections to the presentence report, including the objection and argument that the court should reject Defendant's prior New Jersey felony drug convictions for, according to Defendant, not being similar to his then current convictions. (Doc. 165). The court overruled such objections and reminded Defendant of the Government's noticed intent to enhance his sentence pursuant to 21 U.S.C. §851. (Doc. 82). Subsequently, the court sentenced Defendant to the mandatory term of life imprisonment. (Doc. 167).

Defendant appealed such judgment and sentence to the Third Circuit. *Zayas*, 32 F.4th at 211.[4] On April 21, 2022, the Third Circuit affirmed Defendant's convictions on Counts 1, 2 and 4, and reversed and vacated as to the conviction on Count 3. *See* at 229.

---

[4] Issues raised by Defendant on appeal included: (1) allegations that the Government committed a Brady violation such that Defendant suffered a violation of due process; (2) insufficiency of evidence to support the guilty verdict on Count 2, distribution of controlled substance resulting in death; (3) insufficiency of evidence to support the guilty verdict on Count 1, conspiracy to distribute a controlled substance resulting in death; (4) insufficient of evidence to support the guilty verdict on Count 3, distribution of a controlled substance within 1,000 feet of a daycare center with attached outdoor playground; (5) insufficiency of evidence to support the guilty verdict on Count 4, distribution of a controlled substance to a pregnant individual; (6) claim that the First Step Act precluded imposition of the mandatory minimum sentence of life; and (7) error by the trial court finding that Defendant had a prior felony drug offense.

On January 23, 2024, Defendant filed the instant motion, raising seven grounds – all surrounding ineffective assistance of counsel. (Doc. 209). On the same day, Defendant filed a brief in support of his motion. (Doc. 210). The Government filed their opposition brief on June 28, 2024. (Doc. 226). Shortly thereafter, Defendant filed a reply brief. (Doc. 229). Defendant has also filed a motion for the expansion of the record, (Doc. 211), motion for an evidentiary hearing, (Doc. 230), and a motion for the appointment of counsel, (Doc. 232). Such motions are now ripe for review.

## II. **LEGAL STANDARD**

### A. Motion to Vacate

Under 28 U.S.C. §2255, a prisoner in federal custody "may move the court which imposed the sentence to vacate, set aside, or correct the sentence" on "the ground that the sentence was imposed in violation of the laws of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." §2255(a).

Generally, "[i]n order to prevail on a §2255 motion to vacate, set aside, or correct a sentence, a Petitioner must show '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error

of fact or law that was so fundamental as to render the entire proceeding invalid.'" *United States v. Bates*, 2008 WL 80048, at *2 (M.D. Pa. Jan. 7, 2008) (quoting *Mallet v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)). "The petitioner bears the burden of proof under §2255 and must demonstrate his right to relief by a preponderance of the evidence." *United States v. Ayers*, 938 F. Supp. 2d 108, 112 (D.D.C. 2013) (citation omitted). "Section 2255 does not afford a remedy for all errors that may have been made at trial or during sentencing", "[r]ather, Section 2255 is implicated only when the alleged error raises 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Kinchen v. United States*, 2023 WL 4471509, at *2 (M.D. Pa. July 11, 2023) (quoting *Williams v. United States*, 2016 WL 6892375, *2 (M.D. Pa. Nov. 22, 2016)).

When a petitioner brings a motion pursuant to §2255, the Court has discretion whether to conduct a hearing but is not required to hold an evidentiary hearing if "the motion and files and records of the case show conclusively that the movant is not entitled to relief." *United States v. Booth*, 432 F.3d 542, 545-546 (3d Cir. 2005). However, "[a] hearing is necessary only where the record does not resolve factual allegations, such as in a situation where allegations relate primarily to purported occurrences outside the courtroom upon which the record can shed no real light." *United States*

*v. Jackson*, 2006 WL 3333833 *7 (E.D. Pa. 2006) (Concluding that a hearing was not required because the petitioner pointed to no evidence outside the record that had a bearing upon his claim.). Moreover, "a defendant would not be entitled to a hearing if his allegations were contradicted conclusively by the record, or if the allegations were patently frivolous." *Solis v. United States*, 252 F.3d 289 (3d Cir. 2001).

## B. Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution guarantees the accused in all criminal prosecutions "the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to the assistance of counsel is "the right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). A defendant may be deprived of this right where his counsel fails "to render adequate legal assistance." *Id.*

The U.S. Supreme Court in *Strickland* established a two-prong test to evaluate the effectiveness of the assistance of counsel. In the first prong, the defendant must show "that counsel's performance was deficient," *Strickland*, 466 U.S. at 687, and must prove this by "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* In addition, the defendant must

show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88.

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that under the circumstances, the challenged action "might be considered sound trial strategy." *Id.* at 689.

In the second prong, a defendant must show that counsel's deficient performance "prejudiced the defense," because "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, *cf. United States v. Valenzuela-Bernal*, 458 U.S. 858, 866-67 (1982), and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693. Rather, "[t]he defendant must show

that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.* at 694.   Thus, to state a successful claim for ineffective assistance of counsel, petitioner must show "both that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). "A failure to make the required showing on either prong defeats a defendant's ineffective assistance of counsel claim." *U.S. v. Ayers*, 938 F.Supp.2d 108, 113 (D.D.C. 2013) (citing *Strickland*, 466 U.S. at 700).

### III. **DISCUSSION**

Defendant motions to vacate his conviction and sentence by arguing seven grounds of ineffective assistance of counsel, to wit:

(1)  Counsel was ineffective for "fail[ing] to propose procedurally vital instructions and object to legally invalid theory of guilt;"

(2) Counsel was ineffective for not "investigat[ing] and present[ing] exculpatory discovery for trial and not permit false hearsay testimony;"

- 13 -

(3) Counsel was ineffective for not "present[ing] *Brady* material, call its source as witness and use reports to impeach government witnesses;"

(4) Counsel was ineffective for not "hav[ing] challenged indictments, moved for suppression, severance or bifurcation and present pretrial publicity for bench trial;"

(5) Counsel was ineffective for not "subpoena[ing] witnesses before trial, call available witnesses, present viable defenses available, give opening statement and invoke rule of sequester;"

(6) Counsel was ineffective for "in direct appeal [ ] misrepresent[ing] a vital exculpatory fact in record, [ ] fail[ing] to present exculpatory evidence of victims appearance, fail[ing] to present *Brady* violation of requested criminal history;"

(7) "[C]umulative error of counsels [sic] failings which resulted in prejudice."

The court does not deem it necessary to hold an evidentiary hearing on any of these arguments and will address each of them in turn here.

## A. Ineffectiveness regarding Instructions and Theory of Guilt

Defendant argues that his trial counsel was ineffective for allegedly failing to propose jury instructions sufficient to demonstrate government's

- 14 -

burden to show that the controlled substance sold by Defendant was the "but for" cause of Price's death, and for his counsel's alleged failure to object to a "legally invalid theory" of requiring the Government to prove that the substance sold was merely a "contributing cause" of Price's death. In his brief, Defendant cites to *Burrage v. United States*, 571 U.S. 204 (2014) to support his contention.[5]

In *Burrage*, the Supreme Court held that the controlled substance distributed by the defendant resulting in death, at least where the use of the drug distributed is not an independently sufficient cause of the victim's death or serious bodily injury, must be the "but for cause" of the death or injury. 571 U.S. at 218-19. As in, "it is natural to say that one event is the outcome or consequence of another when the former would not have occurred but for the latter." *Id.* at 212. "By contrast, it makes little sense to say that an event resulted from or was the outcome of some earlier action if the action merely played a nonessential contributing role in producing the event." *Id.* Thus, it would be insufficient to merely show that the controlled substance sold by Defendant merely contributed to Price's death. Rather, the Government had

---

[5] Defendant paradoxically cites to the case his own counsel cited in Defendant's pre-trial brief where this particular issue was raised. (Doc. 125).

the burden to prove that such controlled substance was the "but for" cause of Price's death.

Here, Defendant's counsel reasonably and effectively put such a burden on the Government. Defendant's counsel submitted a pre-trial brief to the court where he raised the issue of "but for" causation and "submit[ted] that the United States has the burden to prove beyond a reasonable doubt that the controlled substance provided to the victim by the Defendant was the "but for" cause of the victim's death." (Doc. 125, p. 1). Additionally, the closing jury instructions specifically asked the jury "to decide whether the offense caused the death of Kathryn Price." (Doc. 141, p. 79). Not to mention, the jury was provided special interrogatories to answer that specific question twice. (Doc. 133, pp. 2, 3) ("Do you unanimously find that the government proved beyond a reasonable doubt that the death of Kathryn Price resulted from her use of the fentanyl distributed by the defendant?").[6]

Furthermore, contrary to Defendant's inaccurate assertion, his counsel and the Government jointly proposed instruction that specifically cited the *Burrage* case and presented a proposed instruction from the "Third Circuit

---

[6] Perhaps Defendant believes that it is necessary that the actual words "but for" be included in the instructions and interrogatories to meet the causation charge. The court does not agree, nor is there any case law supporting such a requirement.

Model Criminal Jury Instructions, §6.21.841A," that, in no uncertain terms, requested a showing of "but for" causation. (Doc. 115, p. 13-14) ("That the use of the fentanyl by Kathryn Price was a cause without which her death on July 6, 2016 would not have occurred."). This joint proposed instruction by the Government (and his counsel) also counters Defendant's baseless argument that the Government presented an "alternate theory of guilt" requiring a showing of contributory cause. (*See* Doc. 210, p. 3). Indeed, this court has sifted the record and found no facts whatsoever that support Defendant's contention that the Government ever posited a "legally invalid theory" of requiring merely a "contributing cause" to Price's death. Given that, how can Defendant expect his counsel to object to something that didn't even happen.

Accordingly, Defendant has failed to show any merit to his first ground for ineffective assistance of counsel.

## B. Ineffectiveness regarding Exculpatory Evidence and Testimony

Defendant next argues that his trial counsel was ineffective for allegedly failing (1) to investigate and present certain video evidence that would have exculpated him; and (2) challenge certain testimony – that Defendant labels as "false" – about the video evidence presented at trial.

First, the video evidence Defendant alludes to is the video footage of a main thoroughfare[7] from "Camera 1" of the Price family's video surveillance footage between 9:30 PM and 10:00 PM on the day of Price's death. During that time, Price had left her house to take her dog out for a walk for around 5 minutes (between 9:38 PM and 9:43 PM).[8] (Doc. 210, Ex. 2.1-2.3). Around the same time, observed on Camera 1's video footage, two unknown individuals are seen exiting an unknown vehicle – which was more than half a block down the main thoroughfare away from the Price's residence – crossing the road to enter another unknown vehicle even further away from the Price's residence. (Doc. 214, Vid. Rec. 9:39:34 PM – 9:40:04 PM (30 seconds)). Those unknown individuals remain in the second car until they make their return to the first vehicle at 9:43:50 PM. (*Id.*). During the entirety of Camera 1's video footage between 9:30 PM - 10:00 PM, Price is not seen at all. (*See generally, id.*). Defendant argues that this evidence, without more,

---

[7] Upon being asked whether S.A. Begley was familiar with the location of Price's family residence, he responded that it is located on a "main thoroughfare." (Doc. 147, T.T. 6/21/16, p. 45). A main thoroughfare is a main road for public use, which are generally known to be busy. *See* §70. Through streets, 5A Ordinance Law Annotations Traffic §70 ("Where the general law authorizes a municipality to designate certain streets as "main thoroughfares", an ordinance using the language "main highway" and "through street", rather than "main thoroughfare", is authorized, because for all practical purposes the terms are synonymous.") (citation omitted).

[8] These times are approximates.

exculpates him as it would allegedly show that someone else (assumedly the individuals exiting the car) distributed the drugs that Price ingested which led to her death, and not the drugs he distributed hours earlier. Specifically, Defendant writes that Price, while walking her dog, "walks in direction of vehicle"[9] and "[l]ikely aware of video surveillance monitor in living room [sic] by her mother, [Price] is on lot side of chain link fence," outside of any camera view, when "possible hand to hand transactions with [Price]" occurred. (Doc. 210, p. 8). The footage does not show any of that. Nor does it suggest it. If anything, the video only shows two unknown individuals exit one vehicle at 9:39:34 PM, walk straight across the thoroughfare to enter another vehicle – without, importantly, ever pausing for any conjectured hand-to-hand transactions – remain inside that other car, and then return to their vehicle at 9:43:50 PM; nearly a minute _after_ Price had already returned home. (Doc. 214, Vid. Rec. 9:39:34 PM – 9:43:50 PM; Doc. 210, Ex. 2.3). Again, at no point are these unknown individuals ever seen interacting with Price or anyone else as they exit one vehicle and enter another.

The issue is not whether Defendant's counsel possessed this footage since Defendant himself admits that he reviewed the entirety of the video surveillance, with his court appointed investigator, and had raised the issue

---

[9] The video footage does not bear that out.

of the footage "multiple times throughout trial to counsel[.]" (Doc. 210, p. 8).[10]

Rather, the issue – Defendant supposes – is that his counsel and investigator failed to investigate and present this footage at trial. Footage, Defendant argues, that would have exculpated him since it established that someone else distributed fentanyl to Price that evening resulting in her death. The court flatly disagrees. The video footage of Camera 1 neither shows nor suggests a second dealer. And, contrary to Defendant's assertion, his counsel actually did raise the issue of Price's temporary absence during that timeframe when he cross-examined S.A. Begley. To wit:

> **[Defense Counsel].** On direct examination you testified about the video of Kathryn leaving the home to take the dog for a walk at or about 9:30 or 9:40.
>
> **[S.A. Begley].** I testified she was taking the dog to pee, yes, sir.
>
> **[Defense Counsel].** Okay. And the jury was shown that video. So now, did you also say that you watched the video after that time?
>
> **[S.A. Begley].** Yes, sir, I watched all the video.
>
> **[Defense Counsel].** And you said you didn't see Kathryn again?
>
> **[S.A. Begley].** At that particular time, no.
>
> **[Defense Counsel].** No. After she goes back in with the dog until the time of her sad death you don't see her in any video?

---

[10] Defendant even had his friend raise the issue of the footage to both his counsel and investigator the day prior to S.A. Begley's trial testimony, who testified about all footage from the night of Price's death. (Doc. 210, p. 8).

**[S.A. Begley].** No, sir.

**[Defense Counsel].** Okay. And did you see -- you didn't see anybody else coming to the house?

**[S.A. Begley].** No, sir.

**[Defense Counsel].** Did you see any cars pulling up and stopping in the vicinity of the house?

**[S.A. Begley].** No, sir.

**[Defense Counsel].** Did you see any unusual traffic on the street, on 23rd street?

**[S.A. Begley].** No, sir.

**[Defense Counsel].** And how much -- how long did you watch for it? I mean, what timeframe did you --

**[S.A. Begley].** Sir, I watched every second of every video that was provided to me.

(Doc. 147, T.T. 6/21/16, pp. 82-83). By highlighting Price's temporary absence from the video footage, Defendant's counsel elicited sufficient testimony from this cross examination for a jury to believe, if it was so inclined,[11] that there may have been a second deal made during that dog walk. Thus, the issue ultimately is one of legal strategy, for which Defendant believes, in hindsight, his lawyer picked the wrong one. Regardless of Defendant's opinion, when reviewing a trial counsel's conduct, "it is critical that courts be 'highly deferential' to counsel's reasonable strategic decisions

---

[11] Clearly, the jury was not.

and guard against the temptation to engage in hindsight." *Marshall v. Hendricks*, 307 F.3d 36, 85 (3d Cir. 2002). Here, Defense counsel's strategic decision was reasonable, and this court will defer to it.

Second, Defendant argues that his counsel failed to challenge S.A. Begley's allegedly "false" testimony regarding the video footage of that night. Defendant contends that "Agent Begley goes on to testify, without opposition, objection or showing any videos referenced, that he focused attention [sic] to videos surrounding the last time the victim left the house and no videos, specifically referencing camera 1, showed anyone ever near the house or the victim after last meeting with defendant." (Doc. 210, p. 8). The court disagrees. Concerning S.A. Begley's testimony of Camera 1 footage, Defendant seems to have missed that his counsel did not object to it because the footage <u>actually</u> did not show anyone approaching the house or Price. And as to whether his counsel sufficiently challenged S.A. Begley's testimony, the above published cross examination excerpt demonstrates his counsel did just that. *See supra* pp. 20-21.

Accordingly, Defendant has failed to show any merit to his second ground for ineffective assistance of counsel.

## C. Ineffectiveness regarding Presentment of *Brady* Material and Impeachment

Defendant next argues that his trial counsel was ineffective for allegedly failing to present "*Brady* material, call its source as witness and use reports to impeach government witnesses." (Doc. 209, p. 7). Specifically, Defendant alleges that on the last day of trial, prior to the testimony of S.A. Begley, Defense counsel was provided with a DEA6 report and two pages of handwritten notes from a DEA Analyst, where she noted that Defendant proclaimed during his interview that he delivered white bags to Price on the day of her death. (Doc. 210, pp. 12-13; Doc. 226, p. 33). Armed with such information, Defense counsel – Defendant alleges – should have challenged S.A. Begley's testimony and called the DEA Analyst to admit these notes and display to the jury Defendant's early proclaimed belief that the controlled substance he distributed to Price was allegedly in white bags, and not blue bags which allegedly contained the fatal dose of fentanyl. (*Id.*). The court disagrees and finds that (1) Defense counsel reasonably and effectively challenged S.A. Begley's testimony regarding the white/blue bags contention; and (2) not calling the DEA Analyst (with her handwritten notes and the DEA6 report) was not necessarily an error, but even if it was, there

was not a reasonable probability that the result of the proceeding would have been any different.

First, the Defendant's proclamation that he distributed drugs in white bags, and not blue bags which allegedly contained the fatal dose of fentanyl, has been evoked at every turn—from the moment Defendant sought the withdrawal of his guilty plea, through trial, through his appeal, and now, once again, here. (Docs. 30, 34, 52, 209, 210). Defense counsel has hammered on this issue throughout trial, and specifically challenged S.A. Begley on it during cross examination. To wit:

> **[Defense Counsel].** Now, that's Exhibit 9, and I can put Exhibit 10 up. Now, do you know of or recall any pictures of **<u>blue</u>** Glassine bags found at Mr. Zayas's residence?
>
> **[S.A. Begley].** To my recollection, no.
>
> **[Defense Counsel].** Okay. Now, in your interview with Mr. Zayas you indicated that you did ask him what the **<u>color</u>** of the bags were that he had delivered to Kathryn Price on the 6th of July?
>
> **[S.A. Begley].** Yes, I did.
>
> **[Defense Counsel].** And he told you that they were **<u>white</u>**?
>
> **[S.A. Begley].** No, sir. He said he was not sure, but he thought maybe they were **<u>white</u>**.
>
> **[Defense Counsel].** Okay. And then, you know, months later in April of 2017 you had a subsequent conversation with him, and that issue came up again, what the color of the bags were, correct?
>
> **[S.A. Begley].** Yes.

**[Defense Counsel].** Okay. And at that time again he told you the ones he had were **white**?

**[S.A. Begley].** Again, sir, he thought maybe they were **white**.

. . .

**[Defense Counsel].** And do you know whether anybody on your investigative team had contacted him between the incident date of July 6 and the arrest date of August 10th?

**[S.A. Begley].** Yes, sir. I believe Trooper Petros testified that he saw him within the residence of 534 West 5th Street, but when they went to attempt to contact him he ran out the back door.

**[Defense Counsel].** Any other contact by your investigative team and Mr. Zayas during that period?

**[S.A. Begley].** During that period I believe, that was the only attempted contact of Mr. Zayas, but again, I'm not sure.

**[Defense Counsel].** So would you agree with me that during that period you never disclosed to Mr. Zayas this question about the **blue** bag and the **white** bag?

**[S.A. Begley].** No, sir.

**[Defense Counsel].** . . . Between July 5 and August 10, the date of the incident and the date of your initial interview with Mr. Zayas, did you tell him that there was a **blue** Glassine bag found in Kathryn Price's bedroom with residue in it?

**[S.A. Begley].** I believe it was July 6, but again, I didn't have any conversation with Mr. Zayas as to what was at that scene because I was not at that scene.

**[Defense Counsel].** Do you have any reason to know that he -- at the time you interviewed him that he understood this whole issue about the difference between the **blue** bag and the **white** bag?

**[S.A. Begley].** What issue, sir?

**[Defense Counsel].** Well, do you have any reason to believe that he knew that there was a **blue** bag found in Kathryn Price's residence with fentanyl residue?

**[S.A. Begley].** No, sir.

**[Defense Counsel].** And then you asked him whether or not the bags that he had given to her were **blue** or **white** and he said he thought they were **white**?

**[S.A. Begley].** No, sir. I asked Mr. Zayas if he recalled what **color** the bag was. I never mentioned whether they were **blue** or **white**. He stated he thought, but he was not sure, it might have been **white**.

**[Defense Counsel].** Do you recall when you first received Kathryn's cell phone?

**[S.A. Begley].** Hum, it would be documented in a DEA 6 and a DEA 7A. But it was turned over with all or the majority of the evidence. Again, approximately a week or two after July 6.

**[Defense Counsel].** Very good. And do you recall when you first looked at the text messages on that cell phone?

**[S.A. Begley].** That would be more than likely during the first time my partner and I met with Trooper Quiroz down at the Hazleton Troop N barracks in Hazleton, Pennsylvania, and again, that was within a week possibly of her death. Again, I don't recall the date because it wasn't something we would document.

. . .

**[Defense Counsel].** And when you looked at Kathleen's cell phone maybe a week or so after July 6, 2016, you saw some cell phone messages from Dee?

**[S.A. Begley].** No, sir, I never looked at her cell phone.

**[Defense Counsel].** And would you put up 4.1 please. And did see this – do you recall seeing this message, 4.1?

**[S.A. Begley].** Yes.

**[Defense Counsel].** And that's on June 29, right?

**[S.A. Begley].** Yes, sir.

**[Defense Counsel].** And who is it -- can you have someone else meet me? Okay. Right?

**[S.A. Begley].** Yes, sir.

**[Defense Counsel].** Okay. How about 4.2? These are cell messages between Dee and Kathryn and they extend to the next day to June 30th?

**[S.A. Begley].** Yes.

**[Defense Counsel].** How about 4.3? We're still on June 30.

**[S.A. Begley].** Yes, sir.

**[Defense Counsel].** And the top message is you got 30?

**[S.A. Begley].** Yes.

**[Defense Counsel].** I believe that you've testified and Trooper Quiroz testified this was talking about a drug deal?

**[S.A. Begley].** Yes.

**[Defense Counsel].** Okay. How about 4.4. These are continuing on the 30th.

**[S.A. Begley].** The 30th into the first, yes, sir.

**[Defense Counsel].** And she says, Plus, you're the only person I get shit from?

**[S.A. Begley].** Yes.

**[Defense Counsel].** And again, I think that that – she's saying you're the only person that gets me drugs?

**[S.A. Begley].** That's what she claims, yes.

**[Defense Counsel].** How about 4.5? She says -- this is where – we're still on the 30th, right, at the end of the -- I got your money plus more?

**[S.A. Begley].** Yes, sir.

**[Defense Counsel].** Okay. That's the money to buy the drugs that she buys from Dee?

**[S.A. Begley].** On that day possibly.

**[Defense Counsel].** I got your money plus more?

**[S.A. Begley].** I don't know if that's necessarily indicative of a drug transaction that day. It's indicative to me that she owes him money.

**[Defense Counsel].** She's been talking to him about drug transactions and then she talks about owing him money and you don't think there's a connection?

**[S.A. Begley].** No, sir.

**[Defense Counsel].** Okay. Continuing on to Exhibit 4.6. I got your money. And he says I camming. What does that camming mean?

**[S.A. Begley].** I don't know, sir. I'm going to speculate that he mistyped and it's supposed to be coming.

**[Defense Counsel].** And he tells her on this date, July 2, we're now on July 2, I got the **blue** one?

**[S.A. Begley].** Yes, sir.

**[Defense Counsel].** And that July 2, now that's only four days before her death, right?

**[S.A. Begley].** Yes.

**[Defense Counsel].** And then continuing on to 7:23 on that date, on July 2, I'm a coming tonight so hold one?

**[S.A. Begley].** Yes.

**[Defense Counsel].** That referred to drugs?

**[S.A. Begley].** Yes.

**[Defense Counsel].** And then let's move to 4.8. I think we're still on the same day of July 2. You have the **blue** one. I can't wait. Correct?

**[S.A. Begley].** Yes.

**[Defense Counsel].** And then again, that's a reference to drugs?

**[S.A. Begley].** Yes.

**[Defense Counsel].** Okay. And then moving on to Exhibit 4.9. Another reference, you have the **blue** one. Again, we're talking about drugs. This reference to the **blue** one is talking about drugs?

**[S.A. Begley].** They were talking about the bags, yes.

**[Defense Counsel].** Talking about the bags. Wouldn't you agree with me, when they're talking about drugs in a bag and they're talking about **blue**, that kind of tells you the bag is **blue**?

**[S.A. Begley].** Yes.

**[Defense Counsel].** And this is Dee, the **blue** bag?

**[S.A. Begley].** Yes, sir, it is.

**[Defense Counsel].** And the bag in which residue was found on the night Kathryn died was **blue**?

**[S.A. Begley].** Yes, sir.

**[Defense Counsel].** And the bag in which the state police laboratory analyzed and said contained fentanyl was **blue**?

**[S.A. Begley].** Yes.

**[Defense Counsel].** And that was the fentanyl that killed her?

**[S.A. Begley].** Yes.

**[Defense Counsel].** Okay. Let's try 4.10. I'm having -- this is not coming across -- 4.10 -- let me just move to 4.12. It's hard to read that. I won't need til Friday?

**[S.A. Begley].** Yes.

**[Defense Counsel].** She's telling him there she doesn't need them til Friday?

**[S.A. Begley].** Yes.

**[Defense Counsel].** But she got it before then because by Friday she was dead, wasn't she?

**[S.A. Begley].** Yes, on July 6, which was before Friday, and she got from Mr. Zayas.

**[Defense Counsel].** Friday was July 8?

**[S.A. Begley].** Yes.

**[Defense Counsel].** And she died on July 6 from fentanyl in a **blue** bag?

**[S.A. Begley].** She died from July 6 into July 7, sir, yes.

**[Defense Counsel].** From fentanyl in a **blue** bag that she had previously discussed with Dee?

**[S.A. Begley].** No, not that **blue** bag.

**[Defense Counsel].** Oh. So you think – you're thinking this is a real coincidence? She's talking about Dee, purchasing a **blue** bag of drugs from Dee. And then she dies and there's fentanyl in a **blue** bag, and it

- 30 -

just happens to be there's a **blue** bag from some other source out there?

**[S.A. Begley].** There's nothing in that text conversations that – that suggests that she purchased a **blue** bag from Dee on July 6.

**[Defense Counsel].** Well, there may not be a suggestion, but it sure looks like she did?

**[S.A. Begley].** Not on July 6.

**[Defense Counsel].** She's talking about doing it?

. . .

**[Defense Counsel].** No, I guess it's a couple days before. July 4?

**[S.A. Begley].** Yes.

**[Defense Counsel].** 3rd, 4th and 5th she talks about purchasing a **blue** bag of fentanyl?

**[S.A. Begley].** On July -- from June 29 through June -- July 4 she has text conversations with Dee referencing **blue** bags.

**[Defense Counsel].** Now, you're present when the various scientific experts testified in the courtroom during this case, right?

**[S.A. Begley].** Yes.

**[Defense Counsel].** And I'm not sure which one, but I think it was Mr. McMullin, the toxicologist, he said that fentanyl lasts. I mean, if you buy it on one day it's not bad the next day?

**[S.A. Begley].** Yes.

**[Defense Counsel].** It has its power and the power lasts for a while?

**[S.A. Begley].** Yes.

**[Defense Counsel].** So if someone were to purchase a **blue** bag of fentanyl, a **blue** bag containing fentanyl on July 2d or 3rd it would still have enough power to kill somebody on July 6?

- 31 -

**[S.A. Begley].** Yes, sir.

**[Defense Counsel].** And whether that -- so, the date of purchase of a drug, fentanyl, is not important. What's important is it's fentanyl and that's what killed her?

**[S.A. Begley].** Yes, sir.

(Doc. 147, T.T. 6/21/16, pp. 71-78) (emphasis added). Thus, Defense counsel challenged S.A. Begley and raised the issue of Defendant's early (and repeated) proclamation about his belief that he distributed white bags to Price, and not blue bags.[12]

Second, failing to call the DEA Analyst to testify that Defendant proclaimed he distributed white bags during his interview or admit into evidence the analyst's recordings of such, was not necessarily an error. Rather, it was a strategic decision reasonably taken by his counsel on how to introduce the issue of Defendant's proclaimed belief. Thus, the court defers to it.

Moreover, even assuming that it was in error, the Defendant has not shown a reasonable probability that the result of the proceeding would have been any different. Again, the issue pertained to Defendant's <u>belief</u> that he

---

[12] The court would also add that a DEA Analyst's recording of Defendant's proclaimed belief does not, by itself, transmute such a belief into a fact. Nor does the jury have to believe it.

distributed white bags. This issue was raised multiple times with his counsel cross examining several Government witnesses about the discrepancy in the color of the drug bags, the fact that a blue bag containing fentanyl was found near Price's body, the references to the text exchanges between Price and a second dealer ("Dee") about blue bags, and Defendant's statement that he believed he delivered white bags. Cumulative evidence of the same, in a form of handwritten notes or a DEA6 report, would not have changed that calculus. Unfortunately for Mr. Zayas, there was more than enough evidence for the jury to find him guilty. Prejudice under *Strickland* requires more than a mere "possib[ility that] a reasonable doubt might have been established if counsel acted differently." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). [13]

---

[13] This particular point was made evidently clear to Defendant in his appeal to the Third Circuit, where the Circuit Court noted, in no uncertain terms: "Here, there was no prejudice. Zayas's assertion—that he believed he delivered drugs in white bags—was not new information. He raised this concern in his *pro se* letter seeking to withdraw his guilty plea. He also had his arrest interview statement expressing his belief that he delivered drugs in white bags. It is therefore difficult to see how failure to disclose the DEA's note referencing this same belief would have affected Zayas's trial strategy. Moreover, Zayas cross-examined several government witnesses about this discrepancy in the color of the drug bags, the fact that a blue bag containing fentanyl was found near Price's body, the references in text exchanges between Price and Dee about blue bags, and Zayas's statement that he believed he delivered white bags. During cross-examination Trooper Bachman confirmed both blue and white bags were found at the scene of Price's death. Trooper Quiroz was questioned about Dee's text message about the "blue one" and about the blue glassine baggie found near Price in

*(footnote continued on next page)*

Accordingly, Defendant has failed to show any merit to his third ground for ineffective assistance of counsel.

## D. Ineffectiveness regarding Indictments, Suppressions and Pre-trial Publicity

Defendant next argues that his trial counsel was ineffective for allegedly failing to "challenge[] indictments, move[] for suppression, severance or bifurcation and present publicity for bench trial." (Doc. 209, p. 9). Despite the scattered approach Defendant has opted in presenting this laundry list of arguments, the court will address each in turn.

### i.    <u>Indictment and Grand Jury Transcripts</u>

First, Defendant argues that his counsel did not challenge either the indictment or grand jury transcripts during the pretrial stage for allegedly bearing "false statements." (Doc. 10, p. 15). These "false statements" Defendant alleges are the same contended statements in his second ground; that Camera 1 video footage – according to Defendant – shows a second

---

her room. Additionally, Special Agent Begley was cross-examined about Zayas's post-arrest statement and about how no blue bags were found at Zayas's house during the execution of a search warrant. To the extent that the government delayed disclosure of the DEA's note of Zayas's statement, Zayas was nevertheless able to use that information. He was clearly not prejudiced by any delayed disclosure of his own statement that he was well aware of, and the District Court correctly rejected his attempt to dismiss the superseding indictment on that ground." *Zayas*, 32 F.4th 211 at 230.

drug deal occurring at the night of Price's death and the Government has misrepresented such showing. *See supra* pp. 17-22. As previously noted, the court does not agree with Defendant's rendition of the video footage of that evening. Thus, having failed to show any false statements, this argument is meritless.

### ii.   <u>Suppression of Additional Count</u>

Second, Defendant argues that his counsel was ineffective for failing to move to suppress an additional count to the Superseding Indictment for being allegedly untimely and adding no new facts. (Doc. 209, p. 8; Doc. 210, p. 16). Defendant alleges that his counsel should have moved for the dismissal of the indictment under 18 U.S.C. §3161(b) of the Speedy Trial Act because the Government filed it more than 30 days after his arrest. (Doc. 210, p. 16).

The Speedy Trial Act requires that trial begin within 70 days of a defendant's initial appearance. 18 U.S.C. § 3161(c)(1). The speedy trial clock started on August 11, 2016, when Defendant was first arraigned. (Doc. 7); *see also United States v. Willaman*, 437 F.3d 354, 357 (3d Cir. 2006). Defendant's own counsel then filed, and this court granted, motions for continuances, which paused the speedy trial clock. (Docs. 16, 17, 18, 19, 20, 21, 22 and 23). The Government followed with its filed and granted motions

for continuances. (Docs. 24, 25, 26 and 27). Then, a guilty plea was entered, (Doc. 30), and later withdrawn (Doc. 72)—with numerous briefings and counsel substitutions in between, which Defendant is clearly cognizant of. The plea change was later followed by further motions for continuances, (Docs. 83, 84, 85, 87, 88, 90, 91, 92), until the Government imposed a Superseding Indictment on January 15, 2019, (Doc. 94), and arraigned Defendant anew on January 17, 2019. (Doc. 102).[14] Motions for continuances were subsequently filed and granted, (Docs. 104, 105, 109 and 113), until trial began on June 17, 2019. (Doc. 137). Defendants' and Government's motions to continue trial, the Court's orders granting them and the changes in plea tolled the speedy trial clock.  Thus, Defense counsel was not ineffective for declining to file a motion under the Speedy Trial Act. *See U.S. v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999) ("There can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument.").

---

[14] "[S]uperseding indictments filed longer than 30 days after an arrest which add charges to those contained in the original indictment do not violate the Speedy Trial Act." *United States v. Komolafe*, 246 F. App'x 806, 809 (3d Cir. 2007) (citing *United States v. Gastelum–Almeida*, 298 F.3d 1167, 1173 (9th Cir. 2002); *United States v. Hemmings*, 258 F.3d 587, 591–92 (7th Cir. 2001); *United States v. Mosquera*, 95 F.3d 1012, 1013 (11th Cir. 1996)).

Defendant, arguably, brings a constitutional speedy trial claim, as well. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial." U.S. Const. amend VI. In evaluating a Sixth Amendment speedy trial claim, courts consider: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted his speedy trial right; and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). To the extent Defendant raises this claim, he either misremembers his pretrial proceedings or misunderstands applicable law. Whatever the reason for his argument, it fails. Although about three years passed between the initial indictment and Defendant's trial, he largely caused the delay by requesting continuances, changing his counsel and plea multiple times, and the complexity of the case supported such a run-up to trial. Defendant presents no other reason for the delay, does not allege that he asserted his speedy trial right and points to no prejudice suffered as a result of the delay. In short, Defendant comes nowhere near his burden of demonstrating this claim's merit. *See U.S. v. Davies*, 394 F.3d 182, 189 (3d Cir. 2005).

### iii.   <u>Superseding Indictment</u>

Third, Defendant argues that his counsel was ineffective for not challenging the sufficiency, ambiguity or specificity of the Superseding

Indictment as, he alleges in conclusory fashion, "it fails to allege with sufficient clarity or specificity the conduct constituting the offenses charged" and uses "generic wording of a statute." (Doc. 210, p. 16).

Federal Rule of Criminal Procedure 7 provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charge." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient as long as it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." *United States v. Vitillo*, 490 F.3d 314, 320 (3d Cir. 2007) (internal quotation marks omitted). In other words, "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989) (emphasis added). The changes in the Superseding Indictment were understood by this court, Defense counsel, the grandy jury, the petit jury, and the Third Circuit. *Zayas*, 32 F.4th at 229. Thus, this argument is without merit.

iv.    **Suppression of Search and Arrest Warrant**

Fourth, Defendant argues that his counsel was ineffective for failing to suppress his search and arrest warrant. (Doc. 210, p. 17). Specifically, Defendant contends that underlying the search and arrest warrant was an alleged "false statement" regarding, again and with no surprise, Price's 9:38 PM journey outside of her residence. (*Id.*). As correctly noted by the Government, Defendant argues facts in support of this suppression that are belied by the record. The statement was not false as explained above. *See supra* pp. 17-22.

Furthermore, Defendant argues that the probable cause underlying the search warrant failed to provide a nexus between his residence and the contraband seized. (Doc. 210, p. 17). This court may write a great deal on this subject alone, but it will not entertain a claim raised on collateral review that should have been raised by Defendant on his appeal. *See Massaro v. United States*, 538 U.S. 500, 504 (2003) ("[C]laims not raised on direct appeal may not be raised on collateral review.").[15]

---

[15] Defendant seems to have acknowledged that his mother consented to the search, (Doc. 210, p. 18), but challenges the consent, claiming his mother suffered from dementia and cognitive issues without presenting any evidence to support it. After reviewing the Defendant's rendition of the facts underlying this case, this court is disinclined to credit this assertion. And again, Defendant should have raised this in his appeal.

### v.    Suppression of *Mirandized* Statements

Fifth, Defendant argues that his counsel was ineffective for failing to suppress his *Mirandized* statements, claiming that when "he was brought to and seated in a chair handcuffed in his kitchen … he clearly stated he wanted to speak to his lawyer prior to giving statement." (Doc. 210, p. 18). The record does not reflect any of that.

The validity of a defendant's waiver of Miranda rights should be assessed in light of the totality of circumstances surrounding the waiver. *See United States v. Palmer*, 203 F.3d 55, 60 (1st Cir. 2000). In determining whether a defendant's statement was voluntarily made, a court should consider various factors, including the defendant's background and familiarity with the criminal justice system, whether he was informed of his rights, the length and nature of the detention, and any deprivation of food or sleep. *See United States v. Durham*, 741 F. Supp. 498, 504 (D. Del. 1990) (citing cases). A statement should not be deemed involuntary absent evidence that it was obtained "by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Coleman*, 208 F.3d 786, 791 (3d. Cir. 2000); *see also Durham*, 741 F. Supp. at 502. The Government need only prove a valid *Miranda* waiver and voluntariness by a preponderance of the evidence. *See Palmer*, 203

F.3d at 60. A defendant's waiver need not be in writing. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979). An "implicit waiver" of the "right to remain silent" is sufficient to admit a suspect's statement into evidence. *Id.*

The fact that Defendant is now claiming he asked for an attorney at the time of his arrest is flatly unpersuasive. As witnessed by DEA TFO Schoonmaker and Trooper Quiroz of the Pennsylvania State Police, Defendant was advised of his *Miranda* warnings per a DEA Form 13 card immediately upon being secured. (Doc. 210-1, p. 42). Defendant agreed to speak with investigators. (T.T. 6/21/19, pp. 29-32). Furthermore, Defendant has not offered any credible evidence to rebut or call into question the validity of his *Miranda* waiver on the day of his arrest such that his counsel should have reasonably believed that a motion to suppress had a probability of succeeding in light of the totality of circumstances.

"[A] lawyer's performance does not fall to the level of a Sixth Amendment violation under *Strickland* simply because the lawyer fails to pursue any and all nonfrivolous strategies." *Johnston v. Mitchell*, 871 F.3d 52 (1st Cir. 2017) (citation omitted). "[Generally] when defense counsel is faulted for having failed to file a motion to suppress, the failure may constitute ineffectiveness under *Strickland* only when 'no competent attorney would think a motion to suppress would have failed.'" *Id.* (quoting *Premo v. Moore*,

562 U.S. 115, 124 (2011)). Here, any challenge to Defendant's *Mirandized* statements would have been futile since he received his *Miranda* warnings, waived them, and agreed to speak to law enforcement. Moreover, Defendant cannot show prejudice because even without his admissions, his electronic communications and the Price home surveillance captured his sale of fentanyl to Price on July 6, 2016, and included the offer, the negotiated price, and how the sale would be finalized. Thus, this argument is without merit.

### vi. **Suppression of Crime Scene Photos and 911 Call Audio**

Sixth, Defendant argues that his counsel was ineffective for failing to suppress, pursuant to Federal Rule of Evidence Rule 403, alleged "prejudicial evidence" during trial of "crime scene photos of [Price], deceased laying on her bed with her shirt pulled up, exposing her stomach" and the 911 call audio recording of Price's "sister screaming hysterically over the phone [with] family yelling and crying in the background." (Doc. 210, pp. 19-20). Defendant claims that those pieces of evidence carried little probative value which were outweighed by their prejudicial effect of, presumably, inflaming the jury.[16] The court disagrees.

---

[16] Defendant did not state what the prejudice exactly was, but the court has a clear understanding of what he was driving at.

Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed … by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. The photographs of the victim's corpse were relevant to the cause and manner of death, to the time of death, and to the question of her pregnancy. The photographs were not "of such a gruesome and horrifying nature that [their] probative value was outweighed by the danger of inflaming the jury." *United States v. Miguel*, 87 F. App'x 67, 69 (9th Cir. 2004) (quoting *Maxwell v. United States*, 368 F.2d 735, 740 (9th Cir. 1966)). Similarly, the 911 call by Price's sister provided a time of death and substantiated Price's sister's claim that she found Price dead from an overdose. Whatever danger the panic in Price's sister's voice may have had of inflaming the jury, it did not outweigh the probative value of the audio recording.

If Defendant's counsel moved to suppress, this court would have denied it—making such a motion futile and unconstitutive of an ineffectiveness of counsel claim. More than that, even if this motion would have been meritorious, the error here is harmless because Defendant cannot show prejudice. The jury did not convict Defendant out of any inflamed passions but rather due to the overwhelming evidence of, *inter alia*, text

messages, camera footage and admissions, stacked against him. Accordingly, this argument is without merit.

### vii.   **Suppression of Prior Felony Drug Convictions**

Seventh, Defendant argues that his counsel was ineffective for failing to move pretrial to suppress evidence of his prior felony drug convictions should he decide to testify. (Doc. 210, pp. 20-21). Citing Federal Rule of Evidence 404(b), Defendant effectively argues that the Government had sought to introduce his prior convictions only as character evidence and that his lawyer missed the opportunity to successfully bar it. (*Id.*). The Defendant is wrong and is mistaken on the full contours of evidentiary law.

Federal Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). What Defendant has failed to take a note of, however, is that "the court may, on cross-examination, allow [specific instances of conduct] to be inquired into if they are probative of the character for *truthfulness* or *untruthfulness*[.]" Fed. R. Evid. 608(b) (emphasis added). Defendant writes in his brief that the Court told him just that: "as reflected on the record with the court stating 'the government has requested to be able to use prior convictions that you have if you take the stand for purposes of attacking your *credibility*.'" (Doc. 210, p.

20) (emphasis added).[17] Defendant seems to have heard the words, read the words, and wrote the words, but did not understand their meaning.

The futility of moving to suppress Defendant's prior convictions should he have testified was evident in the record; making this ineffective assistance of counsel claim groundless. Defendant did not choose to testify at trial.[18] As such, this argument is without merit.

### viii.   **Suppression of Testimony of Stacy Ann Scott**

Seventh, Defendant argues his counsel was ineffective for failing to suppress testimony of Stacy Ann Scott. (Doc. 210, p. 21). Defendant contends that the testimony of Scott was cumulative because it "provided little more than what was in [Pennsylvania State Police] report statements and the probative value of the testimony had little if any relevance to the government's case-in-chief." (*Id.*). Additionally, Defendant contends that his

---

[17] Though this Court has been unable to locate this statement in the record, it nevertheless conforms with this Court's practice. Specifically, that prior felony convictions – without revealing the nature of the underlying crime – may be used for impeachment purposes should a defendant testify. By concealing the nature of the underlying crime, particularly in drug cases, this Court seeks to protect against the misuse of prior felony convictions as propensity evidence.

[18] At trial, after the Government rested, this court explained to Defendant that "decisions concerning strategy and witnesses and who to call and not to call and even what questions to ask of witnesses" are made in consultation with counsel, but "[t]he decision as to whether or not [to] testify is [Defendant's] and [Defendant's] alone." (Doc. 153, p. 115). Defendant affirmed that he did not want to testify. (*Id.*, pp. 115-116).

counsel was ineffective for not impeaching Scott for bias because Scott was allegedly an evicted tenant of Defendant's sister's property. *(Id.)*

As explained above, Rule 403 provides that "evidence may be excluded if its probative value is substantially outweighed … by considerations of … needless presentation of cumulative evidence." Fed. R. Evid. 403. However, contrary to Defendant's creative rendition of the facts, Scott had relevant, non-cumulative, testimony to offer regarding her encounter with Price and Defendant at Scott's residence around a week prior to Price's death. Scott testified that Price asked her to borrow money and that Defendant was with Price, establishing a prior relationship. Scott testified that Defendant drove a silver car—the same vehicle captured on video driving to deliver drugs to Price on July 6, 2016, the day of Price's death. (T.T. 6/18/16, pp. 157-159). Counsel could not be deemed ineffective for failing to object to relevant and admissible testimony. And as to potential bias, even if counsel had somehow swayed the jury to disregard Scott's testimony by impeachment, the remaining evidence (as illustrated numerous times in this opinion) would have still been stacked against Defendant. With no demonstrated prejudice, this argument is equally without merit.

### ix.    Severance Motion

Eighth, Defendant argues his counsel was "ineffective for failing to enter motions to protect defendant from the obvious[19] prejudice he would be subject to, due to the fact that the victim in his case was pregnant." (Doc. 210, p. 21). In essence, Defendant contends that his lawyer was ineffective for not pursuing a motion to sever Count 4 (Distribution and Possession with Intent to Distribute a Controlled Substance to a Pregnant Individual) from the other counts, to wash away any inflammatory effect that may arise in a factfinder's mind upon discovering that the victim was pregnant. (*Id.*, pp. 21-22). The court strains to understand Defendant's logic here given that such a discovery would have unavoidably been made not by operation of the count, but by the simple fact that the victim was <u>actually</u> and <u>visibly</u> pregnant. Crime scene photos, the autopsy report, video footage of the drug sale, and the Price family members' testimony would have borne that fact regardless of any severance. Defendant's counsel knew the futility of such a request when he told Defendant – who shared his counsel's words in his brief – that "[t]he court is not going to allow it." (Doc. 210, p. 22). The court would not. Accordingly, this argument is without merit.

---

[19] The court disagrees.

**x.    Pretrial Publicity**

Ninth, Defendant argues his counsel was ineffective for not raising in Defendant's motion to waive a jury trial the issue of "prejudicial pretrial publicity" stemming from a press conference held by the U.S. Attorney regarding his case and certain news articles. (Doc. 210, p. 22; Doc. 120). The alleged pretrial publicity merely recited the allegations and facts of the case, as made available on the public record. (*See generally*, Doc. 120). In Defendant's motion to waive a jury trial, his counsel raised the issue that "public passion and feeling with respect to the opioid crisis, together with the unique facts of this case, would render it impossible for him to obtain an impartial jury trial." (Doc. 118, p. 1). As to the "unique facts of this case," the motion noted that that Defendant "is charged with delivery of an opioid to a pregnant woman, resulting in her death." Thus, the potential prejudicial issues of the victim's pregnancy and opioid crisis were raised to the court by his counsel. The court denied it. (Doc. 119). If Defendant had an issue, he should have raised it on appeal rather than raising it now on collateral review, which this court will not entertain. *See Massaro*, 538 U.S. at 504 ("[C]laims not raised on direct appeal may not be raised on collateral review.").

Accordingly, Defendant has failed to show any merit to his fourth ground for ineffective assistance of counsel.

## E. Ineffectiveness regarding Witnesses, Opening Statement and Rule of Sequester

Defendant argues that his counsel was ineffective for failing to "subpoena witnesses before trial, call available witnesses, present viable defenses available, give [an] opening statement and invoke [the] rule of sequester." (Doc. 209, p. 14; Doc. 210, p. 23). The court will address each in turn.

### i.   Pre-trial Subpoenas and Witness Calls

First, Defendant argues that his counsel was ineffective for "failing to subpoena any witnesses prior to trial despite [Defendant] having provided the investigator, Jim Solima, with a list of witnesses to locate for trial." (Doc. 210, p. 23). In his brief, Defendant did not provide this list or explain the nature of the testimony these witnesses would have provided, except for two—"Patrolman Joseph Weiberth" and "Annmarie Howell." (Doc. 210, pp. 23-24). According to Defendant, Weiberth would have served as a witness to Scott's bias (see above, *supra* p. 45) and Defendant's character for, *inter alia*, allegedly serving as "his mother and sister's caretaker for decades." (Doc. 210, pp. 23-24). As to Howell, Defendant claims that she would have also served as a character witness and testified to both knowing Price and

believing that Price did not appear pregnant at the time of her death. (*Id.*, p. 24).

Due to the strong presumption of attorney competence that *Strickland* mandates, where a petitioner claims that his counsel had been ineffective for failing to call potentially important witnesses, the assessment of trial counsel's judgment involves not simply giving the attorney the benefit of the doubt, but also "affirmatively entertain[ing] the range of possible reasons [petitioner's] counsel may have had for proceeding as [he] did." *Branch v. Sweeney*, 758 F.3d 226, 235 (3d Cir. 2014) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011)). As to the second prong, a petitioner must show that, but for trial counsel's failure to call the identified witness, there is a reasonable probability that the result of the trial would have been different. *Hinton v. Alabama*, 571 U.S. 263, 275 (2014); *Strickland*, 466 U.S. at 694. In the case of counsel's failure to call witnesses, *Branch* phrased the prejudice inquiry to be whether there was a "substantial likelihood" that the testimony of the witnesses who did not testify would have changed the outcome of the trial. *Id.* at 238.

Here, Defendant claims that had counsel called Howell, she would have attested to his character and spoke to Price's appearance. The court need not review the wisdom of not previously subpoenaing Howell because

Defendant's counsel exercised sound judgment not calling her as a witness and subjecting her to cross examination. The Government correctly pointed out that Howell had demonstrated a lack of credibility when she testified at a detention hearing on August 16, 2016, where she admitted – under oath – that she was not living in Pennsylvania during the time Defendant sold drugs to Price, (Doc. 123, p. 14); that when she moved to Florida, she left her vehicle in Pennsylvania with Defendant, knowing that he did not possess a valid driver's license, (*id.*, p. 15); that she overlooked Defendant's drug problems while involved with him because she loved him, (*id.*, p. 17); that his drug problems were part of why she left Pennsylvania, (*id.*, p. 18); that there were times she did not want to be around Defendant because of his drug issues, (*id.*, p. 20); that she knew addicted people do whatever they need to do to get drugs, (*id.*, p. 18); she was not aware that Defendant sold suboxone to buy heroin, (*id.*, p. 24); that she knew Defendant was a convicted felon but nevertheless allowed him access to her firearms (*id.*, pp. 24-25); that she understood Defendant to deliver drugs to others to support his addiction (*id.*, p. 27); and, notably, contrary to Defendant's current claim, Howell testified that she did not know Price and only knew of her (*id.*, p. 26). Moreover, it is reasonable to conclude that even if Howell testified contrary to her August 16, 2016, testimony, *i.e.*, that she knew Price and that Price did not appear

pregnant on July 6, 2016, the jury would have rejected her testimony in this regard. Dr. Gary Ross, who conducted the autopsy, along with Price's father and mother, all testified that Price was eight months pregnant. When asked "how big" Price was in her eighth month of pregnancy, her mother stated: "She was huge. You can definitely tell she was pregnant." (T.T. 6/18/19, p. 8). Similarly, when asked how far along Price was in her pregnancy, Price's sister stated, "She had that pregnant belly." (*Id.*, p. 50). Finally, when Price's brother was asked if Price was noticeably pregnant, he responded, "[V]ery." (*Id.*, p. 80).

The above does not lead to even an inference that had counsel called Howell to testify at trial that there is a reasonable probability that the result of the trial would have been different. She had no knowledge of the events of July 6, 2016, and did not know Price. Further, she could not, without committing perjury, attest to Defendant's character as a law-abiding person because she knew about his prior felony convictions and his ongoing drug use, including distribution of controlled substances.

Regarding Defendant's claim that his counsel was ineffective for failing to call Howell at sentencing, (Doc. 209, p. 24), Defendant cannot demonstrate prejudice. He was subject to a mandatory term of life imprisonment and was sentenced accordingly.

As to Weiberth, the Defendant admits that he and his counsel spoke with Weiberth on the fourth day of trial, making the issue of a subpoena moot. (Doc. 210, p. 23). As to serving as a witness to Scott's bias, the court will refer to the above section regarding Scott's bias, finding again that even if counsel had somehow swayed the jury to disregard Scott's testimony by impeachment, the overwhelming remaining evidence would have made such an error harmless. *See supra*, pp. 45-46. As to serving as a character witness, even if Weiberth was called to speak about Defendant's alleged benevolence towards his family, Weiberth would not have been able to testify to any facts contravening the overwhelming evidence presented by the Government against Defendant. Accordingly, there is no substantial likelihood that Weiberth's testimony in any capacity would have changed the outcome of the trial and this argument is meritless.

### ii.  **Viable Defenses**

Second, Defendant argues that his counsel was ineffective for "failing to present viable defenses supported by evidence in discovery without consulting with defendant." (Doc. 210, p. 25). Defendant states that his counsel "presented at trial that the drugs provided by defendant was actually heroin and not fentanyl" and that "[t]his was never defendant's contention," that "defendant merely did not know the drugs were fentanyl," and that "[t]he

incredulousness of this defense is common sense and falls below the standard of competent and effective counsel when counsel knows the toxicology report shows that only fentanyl was in victim's system." (*Id.*). As often seen now, the record plainly contradicts Defendant's assertions.

Prior to the appointment of Mr. Joseph O'Brien as Defendant's fourth and final attorney, Defendant asserted the following in his briefs:[20]

- "Mr. Zayas does not dispute that Ms. Price reached out to him via text messaging on the morning of her death seeking **heroin**." (Doc. 60, p. 1) (emphasis added).

- "The next text in this exchange further establishes that Ms. Price and Mr. Zayas pooled their resources to obtain **heroin**." (*Id.*, p. 2) (emphasis added).

- "[A]round 5:10 pm, Mr. Zayas returned to that location with the dealer, Justin, at which time **heroin** was delivered to Ms. Price." (*Id.*) (emphasis added).

- "Ms. Price and Mr. Zayas became friends, because they were both **heroin** users." (*Id.*) (emphasis added).

- "Mr. Zayas, at his initial interview with police, and in a proffer session, had represented that the packets Ms. Price received

---

[20] These are only a handful of examples found in the record.

from Justin were in a clear/white packet with no stamp on it. (See

Exhibit W at G000031-reporting that Mr. Zayas' told police on

August 10 2016 that the **heroin** Ms. Price received from Justin

as in white packets, a statement long before Mr. Zayas saw any

discovery in this matter, or was yet even charged)." (*Id.*, p. 4)

(emphasis added).

- "And, at 9:00 p.m. she said good night to her parents – 4 hours

  after she used the **heroin** from Justin." (*Id.*) (emphasis added).

- "Thus, it cannot be said that the **heroin** she received from Mr.

  Zayas' source resulted in her death." (*Id.*) (emphasis added).

When Defendant's first attorney (Joseph McGraw) testified about his

interactions with Defendant,[21] his attorney affirmed that "Mr. Zayas admitted

to [his attorney McGraw] and admitted to law enforcement that he had

provided **heroin** to [Price] in the past," (Doc. 70, pp. 36-37), and that "the

two of them tr[ied] to get money to buy **heroin**" and made plans that day of

who "defendant was going to get **heroin** from." (*Id.*, p. 40) (emphasis added).

Thus, contra to Defendant's newfound assertion, he has often contended

that he sold heroin to Price. Even the Third Circuit made a note of such. *See,*

---

[21] This testimony was provided during a hearing regarding Defendant's
successful withdrawal of his guilty plea. (Doc. 70).

e.g., *Zayas*, 32 F.4th at 215-216 ("During a *Mirandized* interview immediately following his arrest, Zayas admitted to selling what he believed to be **heroin** to Price on the day she overdosed.") (emphasis added); *Id.* at 217 ("[Zayas] claims that the evidence shows only that he sold [Price] **heroin**.") (emphasis added).

Next, Defendant contends that his counsel opted for the wrong legal strategy. Rather than arguing Defendant's now preferred angle that there was a second drug deal captured by Camera 1 footage the night of Price's death, his counsel at trial had argued that the drugs that led to Price's death came from previously purchased blue bags from another dealer (Dee) days before. (Doc. 210, pp. 25-26). Thus, Defendant admits that his counsel did provide him with a legal and viable defense but is now unhappy that it did not succeed. Well, "*Strickland* and its progeny make clear that counsel's strategic choices will not be second guessed by post hoc determinations that a different … strategy would have fared better." *Roland v. Vaugh*, 445 F.3d 671, 681-2 (3d Cir. 2006) (citing *Strickland*, 446 U.S. at 689). Thus, this court will not now entertain Defendant's newly devised strategies in hindsight.[22] Accordingly, this argument is baseless.

---

[22] There are "countless ways to provide effective assistance in any given case," strategic choices as to how to defend a case are "virtually unchallengeable." *Strickland*, 466 U.S. at 689-90.

### iii.    **Opening Statement**

Third, Defendant argues that his counsel was ineffective for "failing to give any opening statement which kept defendant from being made aware of the damaging defenses intended to present." (Doc. 210, p. 26). Defendant further adds that his counsel told him "this will preserve our right to make two closing statements," to which Defendant was unable to validate in his legal research. (*Id.*). The court repeats here what it told the jury at the time of trial, that "[t]he defense has a right to do an opening. They can also defer that until the end of the government's case. They have chosen to defer. That's a normal process." (Doc. 148, p. 124). Given there is no error here, the court will dismiss this argument.

### iv.    **Rule of Sequester**

Fourth, Defendant argues that his counsel was ineffective for failing to sequester the Government's witnesses and bar them from hearing each other's testimony. (Doc. 210, p. 26). The allegation, that witnesses were allowed to hear each other's testimony, has no support whatsoever and does not conform with this court's strict practice of disallowing government witnesses from sitting in the courtroom, except for the case's lead agent. Furthermore, "the failure to sequester witnesses is not, in itself, grounds for reversal unless defendant can show prejudice resulting from the failure to

sequester." *Gov't of Virgin Islands v. Edwards*, 233 Fed. App'x. 167, 171 (3d Cir. 2007). Here, Defendant has failed to make such a showing, and the record in this case is replete with evidence that is more than sufficient to establish his guilt beyond a reasonable doubt. *See supra* pp. 41-42. Accordingly, this argument is without merit.

Accordingly, Defendant has failed to show any merit to his fifth ground for ineffective assistance of counsel.

### F. Ineffectiveness regarding Direct Appeal

Defendant argues that his counsel was ineffective in direct appeals for allegedly "misrepresent[ing] a vital exculpatory fact in record," "fail[ing] to present evidence of victim's appearance," and "fail[ing] to present *Brady* violation of requested criminal history [of Stacy Scott]." (Doc. 209, p. 15; Doc. 210, p. 26). The court will address each in turn.

### i.    <u>Conspiracy Count and Supposed Exculpatory Fact</u>

Defendant argues that the Third Circuit reviewed his insufficiency of evidence claim regarding his conspiracy count and agreed with him that the evidence was insufficient to show a conspiracy between himself and Price's other dealer, Dee. (Doc. 210, p. 26). This much is true. *See Zayas*, 32 F. 4th at 221-222. Defendant then explains that the Third Circuit did, however, find the evidence sufficient to prove conspiracy between himself and the other

driver in the silver car, Justin Haines. (Doc. 210, p. 26). This much is also true. *See Zayas*, 32 F. 4th at 222. Finally, Defendant contends that the Third Circuit was incorrect in its finding because of his counsel's misrepresentation. (Doc. 210, p. 26). Specifically, Defendant states that "the defendant was alone in his vehicle in first of two meetings with victim. The only time [Defendant] had a passenger was the last time he saw the victim, after 5:00 pm, to deliver the twenty dollar bundle to the victim. No communications with passenger were presented. This one time presence of the passenger would have been found insufficient but for counsel's misrepresentation of facts." (*Id.*). This much is flatly wrong.

Defendant appears to be disguising an appeal to his direct appeal by mischaracterizing the facts in his case and the findings of the Third Circuit. The Third Circuit succinctly explained the basis for its findings, and it did not hinge on the amount of times Defendant and Haines, together, met with Price. As written, "[t]he text messages between Zayas and Price reveal that they intended to tip Haines for acting as the middleman in the transaction," "Zayas picked up Haines and the two returned to Price's house to deliver the drugs" and "[Haines] was part of a conspiratorial agreement with Zayas to obtain drugs for Price and then distribute drugs to her." *Zayas*, 32 F. 4th 221-222. "The jury could hardly conclude anything other than that Zayas and

Haines conspired together to distribute the controlled substance to Price." *Id.* This court agrees. Accordingly, this argument is dismissed.

### ii.    **Victim's Appearance**

Upon review of this court's Count 4 jury instructions, the Third Circuit found that this court erred in removing the knowledge element from the jury's consideration by instructing jurors that such proof was unnecessary. *See Zayas*, 32 F. 4th at 224. The Third Circuit noted that such an omission was subject to harmless-error analysis and found that, despite the error, no prejudice was found. *Id.* The reason being that the evidence could only support a conclusion that Defendant knew Price was pregnant. *Id.*, at 225. Now, Defendant argues that the Third Circuit based this finding only upon "the families' testimony," which would have been contradicted had his appellate counsel presented "multiple videos and photos of the victim ... shown to the jury but not presented to the court of appeals." (Doc. 210, p. 27). Again, Defendant is wrong on the facts and findings of the Third Circuit.

The Third Circuit based its finding not merely on Price's family's testimony but also on Dr. Ross's testimony and "evidence that Zayas and Price were together in a car only a week before her death in July [and] [t]he jury thus could have readily assumed that her stomach would not have been covered by any kind of heavy clothing that would have prevented Zayas from

seeing her 'pregnant belly.'" *Zayas*, 32 F. 4th at 225. But most importantly, even if Defendant's appellate counsel did not "present" the "multiple videos and photos of the victim shown in trial," counsel need not since the appellate court already had access to all trial exhibits. Accordingly, this argument is without merit and dismissed.

### iii.   *Brady* Violation

Defendant argues that his appellate counsel was ineffective for "failing to present *Brady* violation[23] of [witness Stacy Scott's] requested criminal history" displaying her bias against Defendant to the appellate court. (Doc. 210, p. 27). The court disagrees.

It is well settled that the Government may not use false or perjured testimony that bears upon the reliability and credibility of a witness to obtain a conviction. *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *Mooney v. Holohan*, 294 U.S. 103 (1935); *see also Lambert v. Blackwell*, 387 F.3d 210, 242 (3d Cir. 2004). If "the false testimony could ... in any reasonable likelihood have affected the judgment

---

[23] More appropriately, a *Giglio* violation. Under *Brady*, the Government must provide a defendant with evidence favorable to him when it is material to his guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Under *Giglio*, when the reliability of a witness may be determinative of a defendant's guilt or innocence, the Government must produce evidence affecting the witness' credibility. *Giglio v. United States*, 405 U.S. 150, 154 (1972).

of the jury" a new trial is required. *Napue*, 360 U.S. at 271. Here, Defendant is not alleging that the Government failed to provide impeaching evidence but that his appellate counsel did. In essence, Defendant argues that had his counsel investigated and presented to the court of appeals Scott's criminal history (as an allegedly trespassing evicted tenant of Defendant's sister's property), such evidence would have demonstrated her bias, invalidated her testimony, and, presumably, either resulted in a new trial or vacated his conviction.[24] (Doc. 210, pp. 27-28). This argument failed when Defendant raised it about his trial counsel's conduct, *supra* pp. 45-46, and it fails here.

First, Defendant's counsel could not be deemed ineffective for failing to present evidence of Scott's alleged bias to the appellate court since her testimony was not even at issue in his appeal. Second, as explained previously, Defendant's counsel would not have been able to suppress Scott's testimony neither at trial nor his appeal since her testimony related to relevant and admissible testimony regarding Defendant's previous relationship with Price and his driving of a silver car, the same car he drove the night he delivered drugs to Price. Third, even if counsel had somehow swayed the appellate court to disregard Scott's testimony, there would still

---

[24] The court makes this presumption because Defendant never specified what the result would be from disclosing Scott's alleged bias.

be no prejudice since the remaining evidence (as illustrated numerous times alone) is more than sufficient to establish his guilt beyond a reasonable doubt. Accordingly, this argument is without merit.

Thus, Defendant has failed to show any merit to his sixth ground for ineffective assistance of counsel.

## G. Cumulative Error

Lastly, Defendant argues cumulative effect of multiple errors. (Doc. 209, p. 16; Doc. 210, p. 28). As explained above, the court has either found no error or merely harmless error. This final ground is thus dismissed.

## G. Evidentiary Hearing and Expansion of Record

Defendant requests that the court hold an evidentiary hearing and allow for an expansion of record with respect to his claims under 28 U.S.C. §2255. Under §2255, "the question of whether to order a hearing is committed to the sound discretion of the district court." *Virgin Islands v. Forte*, 865 F.2d 59, 62 (3d Cir. 1989). In exercising that discretion, "the court must order an evidentiary hearing to determine the facts unless the motion and files and records of the case show conclusively that the movant is not entitled to relief." *Id.*; *see also United States v. Day*, 969 F.2d 39, 41–42 (3d Cir. 1992). The Court denies Defendant's request for an evidentiary hearing and

an expansion of the record because the record conclusively establishes that Defendant is not entitled to the relief sought in his §2255 Motion.

## G. Certificate of Appealability

To receive a certificate of appealability under §2253(c) a Petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims at issue debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Defendant has made no such showing, and certificate of appealability will not be issued in his case.

## IV. <u>CONCLUSION</u>

Based on the foregoing, Defendant, Louis Anthony Zayas', motions to vacate, (Doc. 209), expand the record, (Doc. 211), and hold an evidentiary hearing, (Doc. 230) will be **DENIED**; a certificate of appealability will not be issued; and given such denials, his motion to appoint counsel, (Doc. 232), will be **DENIED** as moot. An appropriate order follows.

**MALACHY E. MANNION**
**United States District Judge**

**DATE: October 22, 2024**
16-222-02

- 64 -